1

2

3

4

5

6

7          **UNITED STATES DISTRICT COURT**

8          **EASTERN DISTRICT OF CALIFORNIA**

9   KELVIN SIMS,                          ) Case No.: 1:10-cv-001409-BAM (PC)
                                          )
10              Plaintiff,                ) ORDER GRANTING DEFENDANTS' MOTION
                                          ) TO STRIKE OPPOSITION TO DEFENDANTS'
11          v.                            ) MOTION FOR SUMMARY JUDGMENT
                                          ) (ECF No. 74, 76)
12  SHERRY LOPEZ, et al.,                 )
                                          )
13              Defendants.               ) ORDER STRIKING PLAINTIFF'S OPPOSITION
                                          ) AND SUPPORTING EXHIBITS FILED ON
14                                        ) AUGUST 15, 2014 (ECF Nos. 89, 90)
                                          )
15                                        )
                                          ) ORDER DENYING PLAINTIFF'S MOTION TO
16                                        ) DENY OR POSTPONE CONSIDERATION OF
                                          ) DEFENDANTS' MOTION FOR SUMMARY
17                                        ) JUDGMENT (ECF No. 91)
                                          )
18                                        )
                                          ) ORDER DENYING PLAINTIFF'S REQUEST FOR
19                                        ) APPOINTMENT OF MEDICAL EXPERT (ECF No.
                                          ) 91)
20                                        )
                                          ) ORDER GRANTING DEFENDANTS' MOTION
21                                        ) FOR SUMMARY JUDGMENT
                                          ) (ECF No. 62)
22  _____  )

23

24  **I.      Procedural Background**

25          Plaintiff Kelvin Sims ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in

26  this civil rights action pursuant to 42 U.S.C. § 1983.  This action proceeds against Defendant Lopez

27  for retaliation in violation of the First Amendment, and against Defendants Akanno and Lopez for

28

                                          1

deliberate indifference in violation of the Eighth Amendment and medical malpractice under state law. (ECF No. 27.)  The parties consented to the jurisdiction of the Magistrate Judge.  (ECF Nos. 5, 46.)

On July 8, 2013, Defendants filed a motion for summary judgment on the grounds that the undisputed facts demonstrate that:  (1) Defendants did not violate the standard of care in treating Plaintiff; (2) Plaintiff suffered no injury; (3) Defendants were not deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment; (4) Defendant Lopez is not liable for retaliation in violation of the First Amendment; and (5) Defendants are entitled to qualified immunity because a reasonable person in Defendants' positions could have believed that their conduct was lawful.[1]  (ECF No. 62.)  Plaintiff initially did not file a timely opposition.  Instead, on August 28, 2013, Plaintiff requested appointment of counsel. (ECF No. 63.) The Court denied Plaintiff's request on August 29, 2013. (ECF No. 64.)

On December 18, 2013, Plaintiff filed an untimely motion for an enlargement of time to oppose Defendants' motion for summary judgment.   Plaintiff also requested the appointment of counsel. (ECF No. 66.) The Court denied Plaintiff's request for the appointment of counsel, but granted Plaintiff's request for an extension of time to file his opposition to Defendants' motion for summary judgment, citing the public policy favoring disposition of cases on their merits. Plaintiff's deadline to file his opposition was February 14, 2014, more than seven months after Defendants filed the motion for summary judgment. (ECF No. 67.)

Despite the extension of time, Plaintiff did not file an opposition.  Rather, on March 3, 2014, Plaintiff filed another untimely request for an enlargement of time to file his opposition to the motion for summary judgment.  (ECF No. 68.) The Court granted the request and set the deadline for Plaintiff's opposition as April 7, 2014. (ECF No. 69.)

Again, Plaintiff did not file a timely opposition.  Instead, on April 7, 2014, Plaintiff requested a third enlargement of time to file his opposition to the motion for summary judgment.  (ECF No. 70.) The Court granted the request, but noted that because the motion for summary judgment had been

---

[1]      Concurrent with the motion, Plaintiff was provided with notice of the requirements for opposing summary judgment. (ECF No. 62-2); see Woods v. Carey, 684 F.3d 934 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1988); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

pending since July 2013 further extensions of time could result in prejudice to Defendants. Accordingly, the Court cautioned Plaintiff that any further extensions of time must be supported by good cause.  Plaintiff's deadline to file his opposition was May 8, 2014. (ECF No. 71.)

Yet again, Plaintiff did not file an opposition to Defendants' summary judgment motion. Plaintiff instead filed a motion seeking another thirty-day extension of time to file his opposition. (ECF No. 72.)  During pendency of the motion, Plaintiff filed a purported opposition to the motion for summary judgment on June 2, 2014.  (ECF No. 74.)

On June 6, 2014, Defendants filed a motion to strike Plaintiff's opposition to the motion for summary judgment.  Defendants argued that the opposition was untimely, lacked foundation and failed to conform to the requirements of Federal Rule of Civil Procedure 56(c) and Local Rule 260(b). (ECF No. 76.)

On June 23, 2014, the Court granted Plaintiff's request for an extension of time to file his opposition nunc pro tunc given that Plaintiff had filed a purported opposition.  (ECF No. 80.)

On July 2, 2014, Plaintiff filed a second opposition to the motion for summary judgment, along with a supplement to his opposition.  (ECF Nos. 83, 84.)

On July 23, 2014, Plaintiff filed a request for leave to amend his opposition to the motion for summary judgment.  Plaintiff also filed exhibits, which appeared to be in support of his request for extension of time and his opposition.  (ECF Nos. 85, 86.)

On July 28, 2014, the Court denied Plaintiff's request for an extension of time to amend his opposition to the motion for summary judgment, noting that Plaintiff had continuously disregarded set deadlines and orders in this action.  The Court informed Plaintiff that if he filed additional motions for an extension of time to oppose Defendants' summary judgment motion or additional papers purporting to be his opposition, then those documents would be stricken from the record and would not be considered by the Court.  The Court also granted Defendants an opportunity to file an optional reply to Plaintiff's July 2, 2014 opposition (and the exhibits filed on July 23, 2014) within fourteen days. Additionally, the Court informed the parties that upon expiration of the fourteen-day deadline, the motion for summary judgment would be deemed submitted pursuant to Local Rule 230(l).  (ECF No. 87.)

1       On August 15, 2014, Plaintiff filed a third purported opposition to the motion for summary

2   judgment, along with exhibits.  (ECF Nos. 89, 90.)

3       On August 29, 2014, Plaintiff filed a declaration, which includes argument supporting his

4   opposition, a request to deny or postpone consideration of Defendants' motion for summary judgment

5   pursuant to Federal Rule of Civil Procedure 56(d) in order to allow Plaintiff to obtain declarations

6   from other prisoners, and a request for appointment of a medical expert.  (ECF No. 91.)

7   **II.    Defendants' Motion to Strike Plaintiff's Opposition**

8       On June 2, 2014, Plaintiff filed his initial opposition to Defendants' motion for summary

9   judgment.  (ECF No. 69.)  The opposition is a declaration by an inmate at CSP-Solano, Michael

10  Woody, and purports to be both a request for an extension of time and an opposition to the motion for

11  summary judgment.  (ECF No. 74.)  Defendants opposed the motion for an extension of time as

12  untimely, and moved to strike the opposition.  (ECF Nos. 75, 76.)  On June 23, 2014, the Court

13  granted Plaintiff's request for an extension of time nunc pro tunc.[2]  (ECF No. 80.)  The Court now

14  turns to the motion to strike.

15      Defendants move to strike Plaintiff's June 2, 2014 opposition, i.e., Inmate Woody's

16  declaration, as untimely, lacking foundation and failing to conform to the requirements for opposing a

17  motion for summary judgment under Rule 56(c) and Local Rule 260(b).  For the reasons discussed

18  below, Defendants' motion to strike Plaintiff's opposition filed on June 2, 2014, shall be granted.

19      According to his declaration, Inmate Woody lacks personal knowledge regarding the events at

20  issue in this action.  (ECF No. 74, ¶ 8.)  "Declarations must be made with personal knowledge;

21  declarations not based on personal knowledge are inadmissible and cannot raise a genuine issue of

22  material fact."  Hexcel Corp. v. Ineos Polymers, Inc., 681 F.3d 1055, 1063 (9th Cir. 2012) (citing

23  Skillsky v. Lucky Store, Inc., 893 F.2d 1088, 1091 (9th Cir. 1990) and Fed. R. Civ. P. 56(c)(4)).

24      Inmate Woody's declaration also does not comport with the requirements for opposing a

25  motion for summary judgment.  Federal Rule of Civil Procedure 56(c) requires that declarations

26  opposing a motion for summary judgment be made on personal knowledge.  Fed. R. Civ. P. 56(c)(4).

27

28  ---

[2] Plaintiff filed a second opposition to the motion for summary judgment on July 2, 2014.  (ECF Nos. 83, 84.)

Further, Local Rule 260(b) requires any party opposing a motion for summary judgment to "reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission or other document relied upon in support of that denial." Inmate Woody's declaration does not include an itemized reproduction of Defendants' statement of undisputed nor does it identify those facts that are disputed or undisputed.

### III.   **Plaintiff's Opposition and Exhibits filed on August 15, 2014**

On July 28, 2014, the Court forewarned Plaintiff that if he filed additional motions for an extension of time to oppose Defendants' summary judgment motion or additional papers purporting to be his opposition, then those documents would be stricken from the record and would not be considered by the Court. (ECF No. 87.) In direct contravention of the Court's order, Plaintiff filed a third purported opposition to the motion for summary judgment, along with supporting exhibits, on August 15, 2014. (ECF Nos. 89, 90.)

In keeping with the Court's prior order, Plaintiff's third purported opposition and supporting exhibits filed on August 15, 2014, shall be stricken from the record. These documents [ECF Nos. 89, 90] will not be considered by the Court for any purpose.

### IV.   **Plaintiff's Motion to Deny or Postpone Consideration of Defendants' Motion for Summary Judgment**

On August 29, 2014, Plaintiff filed a declaration, which includes argument supporting his opposition, along with a request to deny or postpone consideration of Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(d). (ECF No. 19.) Consistent with the Court's prior orders, arguments in the declaration supporting Plaintiff's opposition shall be disregarded. The Court now turns to the request to postpone consideration of Defendants' motion for summary judgment.

Plaintiff requests that the Court postpone consideration of the motion for summary judgment so that he may contact possible percipient witnesses and correspond with a prior cellmate assisting him with this action. He asks the Court for an order directing Defendants to supply him with rosters of inmates who were at KVSP during the relevant time period and to allow him to contact these inmates

to supply witness declarations.  Plaintiff also requests that Defendants supply him with employee rosters.

### A.   Legal Standard

"If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). Plaintiff bears the burden of specifically identifying relevant information, where there is some basis for believing that the information actually exists, and demonstrating that the evidence sought actually exists and that it would prevent summary judgment. Blough v. Holland Realty, Inc., 574 F.3d 1084, 1091 n. 5 (9th Cir. 2009) (quotation marks and citation omitted); Tatum v. City and County of San Francisco, 441 F.3d 1090, 1100–01 (9th Cir. 2006). Additionally, Plaintiff must make some showing of diligence, that he sought the requested information during the discovery period, or that there is good reason he has not been able to obtain the information before now. See Landmark Dev. Corp. v. Chambers Corp., 752 F.2d 369, 372 (9th Cir.1985).

### B.   Discussion

Plaintiff has not demonstrated diligence in seeking the requested discovery.  On August 13, 2012, the Court issued a discovery and scheduling order, which set the deadline to complete discovery as April 13, 2013.  (ECF No. 35.)  Plaintiff did not seek to extend the discovery deadline for any purpose, including any third-party discovery.  Following the Court's order of service in this action on March 29, 2012, there is no indication that Plaintiff made any attempts to secure this Court's assistance for purposes of communicating with inmate witnesses or off-site inmate legal assistants. More importantly, Plaintiff waited for more than one year before seeking postponement of the motion for summary judgment.  He also waited until well after his opposition to the motion for summary judgment was due.  Further, there is no indication that the inmates and employees will provide necessary information that would prevent summary judgment.  Plaintiff himself admits that he does not recall the names of inmates or employees.  (ECF No. 91, pp. 6-7.)  Accordingly, Plaintiff's motion to postpone consideration of the motion for summary judgment shall be denied.

///

1      **V.      Plaintiff's Request for Appointment of Medical Expert**

2            Plaintiff requests that the Court appoint an expert "to provide rebuttal testimony to statements

3      entered into the record by Defendants' medical expert."  (ECF No. 91, p. 1.)  Plaintiff believes that

4      Defendants will have an unfair advantage by being able to utilize the opinions of their medical expert.

5            The Court has the discretion to appoint an expert pursuant to Rule 706(a).  In relevant part,

6      Rule 706 states that "[o]n a party's motion or on its own, the court may order the parties to show cause

7      why expert witnesses should not be appointed. . . ." Fed. R. Evid. 706(a); Walker v. American Home

8      Shield Long Term Disability Plan, 180 F.3d 1065, 1071 (9th Cir. 1999).  Pursuant to Rule 702, "a

9      witness who is qualified as an expert by knowledge, skill, experience, training or education may testify

10     in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized

11     knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. . . ."

12     Fed. R. Evid. 702.  While the court has the discretion to appoint an expert and to apportion costs,

13     including apportionment of costs to one side, Fed. R. Evid. 706; Ford ex rel. Ford v. Long Beach

14     Unified School Dist., 291 F.3d 1086, 1090 (9th Cir.2002); Walker, 180 F.3d at 1071, where the cost

15     would likely be apportioned to the government, the court should exercise caution.

16           Based on Plaintiff's representations that he requires expert testimony to rebut Defendants'

17     testimony and add credibility to his claim, it appears that Plaintiff seeks the appointment of an expert

18     witness to assist him in defeating summary judgment.  However, Rule 706 does not contemplate court

19     appointment and compensation of an expert witness as an advocate for Plaintiff.  Manriquez v.

20     Huchins, 2012 WL 5880431, *14 (E.D. Cal. 2012) (purpose of a court-appointed expert is to assist the

21     trier of fact, not to serve as an advocate); Brooks v. Tate, 2013 WL 4049043, *1 (E.D. Cal. Aug. 7,

22     2013) (avoiding bias or otherwise assisting one party is not the purpose of Rule 706); Gorrell v.

23     Sneath, 2013 WL 3357646, * 1 (E.D. Cal. Jul. 3, 2013) (purpose of court-appointed expert is to assist

24     the trier of fact, not to serve as an advocate for a particular party).  The Court does not require a

25     neutral expert to aid its understanding of the deliberate indifference and malpractice claims at issue in

26     this action.  Accordingly, Plaintiff's motion for the appointment of a medical expert shall be denied.

27     ///

28     ///

**II.**   **Defendants' Motion for Summary Judgment**

    **A.**   **Legal Standard**

        Pursuant to Federal Rule of Civil Procedure 56(a) summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Summary judgment must be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  However, the court is to liberally construe the filings and motions of pro se litigants.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (internal quotations and citations omitted).

        If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.

        The parties bear the burden of supporting their motions and oppositions with the papers they wish the Court to consider and/or by specifically referencing any other portions of the record for consideration.  Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The Court will not undertake to scour the record for triable issues of fact.  Simmons v. Navajo County, Arizona, 609 F.3d 1011, 1017 (9th Cir. 2010).

        In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts

and responses thereto, if any, objections, and other papers filed by the parties.  Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection.  This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

**B.**      **Summary of Relevant Allegations**

Since approximately August 29, 2007, Plaintiff has suffered from increasingly severe, excruciating and crippling lower back pain, which has impaired his ability to walk, bend, squat, sit, stand or ambulate and has necessitated the use of a wheelchair for mobility.  His lower back condition—various developing stages of spondylotic spinal stenosis with recurrent compression of L3 and L4 nerve roots—requires treatment with medications and therapies to alleviate chronic pain. Since approximately January 27, 2008, Plaintiff has suffered from severe, excruciating rectal pain and bleeding, which is aggravated by constipation and straining to defecate.

Plaintiff alleges that Defendants Dr. Akanno, a prison physician and surgeon, and Dr. Sherry Lopez, the Chief Medical Officer and/or Health Care Manager, who were both assigned to Kern Valley State Prison ("KVSP"), acted with deliberate indifference to Plaintiff's need for medical treatment.  Plaintiff also alleges that Defendants delayed and failed to provide necessary medical care, including referrals to outside specialists, implementation of treatment recommendations, provision of necessary pain medications, equipment accommodations for his lower back, and corrective surgeries for his back and hemorrhoids.

According to Plaintiff's declaration accompanying his complaint, Plaintiff alleges that Dr. Akanno was his primary care physician during the relevant time period.  On October 27, 2009, Plaintiff was escorted to CTC for a scheduled MRI of his back.  Plaintiff was unable to have the MRI due to his claustrophobic condition.  Dr. Akanno wrote a physician's referral for service for an open-air MRI to be arranged.  When asked about Plaintiff's October 21, 2009 repeat colonoscopy, Dr. Akanno said that the G.I. specialist wanted a repeat colonoscopy.  When questioned about the specialist's recommendations for a high fiber/low sodium diet, Dr. Akanno said he would have to see the colonoscopy results before addressing the special diet issue.  Plaintiff also discussed his issues regarding pain medication and severe pain in the lower back and rectal areas.

On November 18, 2009, Plaintiff informed Dr. Akanno about his rectal pain.  Dr. Akanno said he would provide Plaintiff with pain relief and advised Plaintiff that the G. I. specialist wanted him scheduled for a repeat colonoscopy six months from October 21, 2009.  Plaintiff's October 21, 2009 colonoscopy revealed large internal hemorrhoids.  Dr. Akanno advised that he would make a referral for a third colonoscopy, along with a referral for MRIs of the cervical and lumbar spine.  With regard to the high fiber/low sodium diet, the KVSP dietician had indicated to Dr. Akanno that Plaintiff was receiving such a diet.  Plaintiff said that he was not and remained chronically constipated, straining to defecate and suffering pain.

On December 11, 2009, while on the doctor line, Plaintiff asked Dr. Akanno about the results of his back MRI and the high fiber diet.  Dr. Akanno responded that Plaintiff had arthritis, but he could not say more because he did not have access to Plaintiff's medical file.  Dr. Akanno asked Plaintiff when he last saw the G. I. specialist about his hemorrhoids.  Plaintiff reminded Dr. Akanno that he wrote a referral for a third colonoscopy.  Dr. Akanno scheduled Plaintiff for doctor line in 8 weeks.

On January 13, 2010, Plaintiff saw Nurse Moonga and Dr. Akanno.  Plaintiff showed Dr. Akanno the latest MRI report dated November 17, 2009, and asked him why none of the treatment recommendations had been followed or implemented.  Dr. Akanno did not answer.  He took the MRI reports and made photocopies of them.  Plaintiff reported to Dr. Akanno that he was in severe pain from his lower back and hemorrhoid conditions.  He explained that the Fentanyl patch dosage no longer provided effective pain relief and requested an increased dosage, along with a high fiber diet. Plaintiff also requested back surgery and a hemorrhoidectomy.  Dr. Akanno said that he would discuss these matters with CMO Lopez.

On January 22, 2010, Plaintiff saw Dr. Akanno to discuss the cervical spine M.R.I. results. When Plaintiff asked why he had not been scheduled for surgery, Dr. Akanno said that he needed to let doctors and the CMO do their process regarding his back and other medical needs.  Dr. Akanno also told him that the Federal Receiver's staff, the Prison Law Office and Sacramento said that he complained too much and suggested that Dr. Akanno just ignore him.  Plaintiff advised Dr. Akanno that he was in pain and the patch had lost its effectiveness. Plaintiff also asked Dr. Akanno about his

request for a high fiber diet and hemorrhoid pain relief. Dr. Akanno's response was that he was working on those things.

On February 19, 2010, Plaintiff saw Dr. Akanno and asked him why he had not received back surgery. Dr. Akanno said that back surgery was coming because KVSP's ADA coordinator wanted Plaintiff moved out of the cell as soon as possible. Dr. Akanno said it was taking time to arrange his back surgery because Sacramento had his medical files. When Plaintiff asked Dr. Akanno for pain management, he wrote a referral for Plaintiff to have surgery on his bunions. Dr. Akanno did not want to discuss more than one medical issue. Plaintiff asked what Dr. Akanno intended to do about his back and hemorrhoid conditions, but Dr. Akanno's only response was that he would see Plaintiff in 3 or 4 weeks to discuss the rest of his medical problems.

On February 22, 2010, Plaintiff saw Dr. Akanno's boss, Dr. Swingo, for consultation. Dr. Swingo said that he came to KVSP from Sacramento to talk with Plaintiff about a CDC 7362 request for medical services Plaintiff has submitted concerning his hemorrhoid problems. Dr. Swingo informed Plaintiff that his medical files were not available. Dr. Swingo prescribed fiber pills. Plaintiff showed Dr. Swingo a copy of his latest colonoscopy report. Plaintiff informed Dr. Swingo that he was in excruciating pain due to his hemorrhoids and back conditions. Dr. Swingo said that Plaintiff needed to try to walk and asked how long Plaintiff had been in a wheelchair. Plaintiff told him that he tried to walk, but could not, and had been in a wheelchair since 2007. Dr. Swingo assured Plaintiff that he would talk with Dr. Akanno about increasing his pain medications.

On March 12, 2010, Plaintiff saw Dr. Akanno and requested the status of his back surgery. Dr. Akanno responded that Plaintiff was up for surgery and after surgery was completed Associate Warden R. Keldgord wanted plaintiff moved out of the DPW cell. Dr. Akanno also said that hemorrhoid surgery had been scheduled. Dr. Akanno denied Plaintiff's request for a renewed hot shower chrono as treatment for lower back pain.

On March 15, 2010, Correctional Officer Peterson informed Plaintiff that Dr. Akanno had told him that Plaintiff was denied a shower chrono and that he was not sure that CMO Lopez was going to renew the Fentanyl patch that had expired on March 10, 2010.

As of March 23, 2010, Plaintiff had no pain medication.

On May 7, 2010, Plaintiff was transported to Mercy Hospital for a scheduled EDG examination.  During this examination, Plaintiff asked why he had not yet received hemorrhoid surgery or the high fiber diet previously recommended to KVSP medical staff.  The physician stated that surgical removal of the hemorrhoids was medically necessary and the longer KVSP staff delayed implementation of the treatment recommendations, the more severe Plaintiff's pains would become and his hemorrhoid condition would worsen.

On May 12, 2010, Plaintiff saw Dr. Akanno concerning hot showers as pain relief therapy.  Dr. Akanno indicated that institutional policy prohibited a hot shower chrono.  When asked about back surgery, Dr. Akanno indicated that based on his review of the November 17, 2009 MRI reports, Plaintiff was not a candidate for back surgery.  Dr. Akanno indicated that he requested the neurosurgeon provide his expert opinion whether surgery was necessary.  When asked about hemorrhoid surgery, Dr. Akanno indicated that Plaintiff would regret having surgery.  Dr. Akanno also indicated that CMO Lopez did not want to approve a high fiber diet because Plaintiff complained too much.  Dr. Akanno told Plaintiff that CMO Lopez was the reason Plaintiff's diet, hot shower chrono and surgeries were being denied.  Dr. Akanno further indicated that he could not increase the Fentanyl patch dosage because CMO Lopez would not approve the increase.  Dr. Akanno stated that he continued to write orders and prescriptions, but CMO Lopez continuously denied them.

On May 13, 2010, Plaintiff consented to the increase of his Fentanyl patch dosage.  As of May 30, 2010, Plaintiff had not received the increased dosage.

On June 2, 2010, Dr. Akanno wrote a referral for hemorrhoid surgery.  When asked about back surgery, Dr. Akanno indicated that Plaintiff had his neurosurgeon appointment pending.  Dr. Akanno renewed Plaintiff's medications.

On June 2, 2010, KVSP medical staff and Dr. Akanno discontinued treating Plaintiff's back pains with the Fentanyl patch.  Since that time, Plaintiff did not receive any pain medication.

On June 9, 2010, Plaintiff was transported to Mercy Hospital for a consultation regarding his hemorrhoid condition.  The physician indicated that Plaintiff would not have the large hemorrhoids, internal bleeding and severe pain if KVSP staff had taken his complaints seriously and provided timely medical care.  Plaintiff's only solution was a hemorrhoidectomy, which the physician advised

was a medical necessity, but was a painful procedure with post-surgery pain, side-effects and potential complications. Plaintiff was advised that he would be returned to the prison after surgery. Plaintiff requested a second opinion regarding post-surgery hospitalization. The physician also indicated that Plaintiff should not be given narcotic pain medications because they would aggravate his hemorrhoids and bleeding. Despite this and an earlier recommendation in 2007, Dr. Akanno prescribed, and CMO Lopez approved, narcotic medications for pain from 2007-2010.

On June 14, 2010, Dr. Akanno informed Plaintiff that he was scheduled for hemorrhoid surgery and the pain management clinic. Plaintiff's pain patch had been discontinued. Dr. Akanno advised plaintiff that CMO Lopez and Dr. Spaeth did not want to participate in a face-to-face consultation because Plaintiff wrote too many complaints and they would not recommend him for medical release from custody. Dr. Akanno suggested that Plaintiff should withdraw his complaints if Dr. Akanno arranged for back and hemorrhoid surgeries. Dr. Akanno told Plaintiff that he needed to get out of the wheelchair and walk. Dr. Akanno also told Plaintiff that CDCR medical examiners reviewed Plaintiff's files and advised KVSP medical staff that nothing in Plaintiff's medical records indicated that he needed back surgery.

On June 23, 2010, Dr. Akanno informed Plaintiff that his hemorrhoid surgery was still pending. When asked about back surgery, Dr. Akanno stated that he was waiting for the neurosurgeon's recommendations. Plaintiff asked about pain medication, but Dr. Akanno again stated that he would wait for the neurosurgeon's recommendation. Dr. Akanno did not respond to Plaintiff's request for a second opinion regarding his hemorrhoid condition.

On June 25, 2010, Plaintiff underwent a Telemed consultation with Dr. Rahimifar, who informed Plaintiff that CMO Lopez had refused the request for a face-to-face meeting. Dr. Rahimifar reported that Plaintiff's last MRI revealed serious lower back problems.

### B. Statement of Undisputed Material Facts[3]

1. Plaintiff is a state inmate who was housed at KVSP in Delano, California from October 2005 to November 18, 2011. (Pl's Dep. 6:10-18.)

---

[3] The statement is derived from Defendants' Statement of Undisputed Facts in Support of Motion for Summary Judgment. (ECF No. 62-3.) Unless otherwise indicated, the stated facts are undisputed.

2.      Plaintiff is a high school graduate who never worked in the medical field and has had no medical training.  (Pl's Dep. 47:18-48:2.)

3.      As of July 8, 2013, Plaintiff was 42 years old.  (Pl's Dep. 51:24-25.)

4.      Plaintiff is six feet, three inches tall and during the relevant time period weighed approximately 240 pounds.  (Pl's Dep. 52:1-6; Dr. Barnett Dec. ¶ 15(A).)

5.      Dr. Lopez has been the Chief Medical Officer ("CMO") at KVSP since 2007.  (Dr. Lopez Dec. ¶ 1.)

6.      As the CMO/CME at KVSP, Dr. Lopez manages the institutional Health Care Services staff, and does not examine or treat individual inmates.  (Dr. Lopez Dec. ¶ 2.)

7.      Dr. Lopez has never treated or examined Plaintiff.  (Dr. Lopez Dec. ¶ 2; Pl's Dep. 56:10-12; 93:6-19.)

8.      Dr. Akanno was Plaintiff's primary care physician during the relevant time period. (Compl. ¶ 1.)

9.      Plaintiff alleges that from August 29, 2007, to the filing of the complaint (August 6, 2010), Defendants were deliberately indifferent and committed medical malpractice in regards to his lower back condition.  (Compl.  ¶¶ 8, 11, 12.)

10.     In 2007-2010, MRI studies and clinical examinations indicated that Plaintiff had mild to moderate spondylosis or "degenerative disc disease" ("DDD") of the lumbar spine.  (Dr. Barnett Dec. ¶ 5.)

11.     The MRI studies of his lumbar spine in 2006-2012 revealed disc bulges, mild loss of disc height and foraminal and canal stenosis.  (Dr. Barnett Dec. ¶ 5.)

Plaintiff admits facts 10 and 11, but asserts that his January 11, 2007 MRI noted moderate to severe bilateral foraminal stenosis, greater on the right" and multiple herniated disks, including a large herniated disc at C5-S1.

12.     MRI studies do not always correlate well with actual dysfunction.  (Dr. Barnett Dec. ¶ 5.)

///

///

13.     The March 20, 2007 electromyography ("EMG") results show normal nerve conduction and no sign of active/chronic denervation, plexopathy, radiculopathy, mononeuropathy or polyneuropathy.  (Dr. Barnett Dec. ¶¶ 6, 11.)

Plaintiff's reference to a report from July 20101 does not raise a genuine dispute of material fact regarding findings in 2007.  (ECF No. 83, p. 6.)

14.     The EMG results are significant because they rule out Plaintiff's subjective complaints of radiculopathy (radiating pain).  (Dr. Barnett Dec. ¶¶ 6, 11.)

Although Plaintiff denies this fact, he has not provided competent evidence to establish a genuine dispute.  (ECF No. 83, p. 6.)

15.     There is no objective evidence that Plaintiff suffered neurologic dysfunction as a result of DDD.  (Dr. Barnett Dec. ¶¶ 5, 6, 23.)

Although Plaintiff denies this fact, he has not provided competent evidence to establish a genuine dispute.  (ECF No. 83, p. 6.)

16.     DDD affects approximately 85 percent of adults over the age of 50.  Over time, all people will exhibit changes in their discs consistent with a greater or lesser degree of degeneration.  (Dr. Barnett Dec. ¶ 7.)

17.     DDD is not really a disease at all, but rather a degenerative condition occurring normally and naturally with aging.  (Dr. Barnett Dec. ¶ 7.)

18.     Plaintiff's level of disc degeneration such as exists in his lumbar spine is very common and is a natural part of aging.  (Dr. Barnett Dec. ¶ 8.)

Plaintiff disagrees because he is not over 50 and his level of disc degeneration was not normal.  However, Plaintiff has not provided any competent expert testimony to support his disagreement and raise a genuine dispute of material fact.  Fed. R. Evid. 702.

19.     Disc bulges or protrusions are very common even in younger adults, and may go unnoticed.  (Dr. Barnett Dec. ¶ 8.)

20.     Authoritative studies have found that disc bulges do not necessarily cause pain.  MRI findings of bulges in patients with low back pain may not be due to the bulges at all, but may be coincidental.  (Dr. Barnett Dec. ¶ 8.)

21.    The EMG results make it highly unlikely Plaintiff's reported disc bulges were clinically significant.  (Dr. Barnett Dec. ¶¶ 10-11.)

22.    A bulging disc can often heal on its own or with non-operative care.  (Dr. Barnett Dec. ¶ 12.)

23.    The lastest MRI of Plaintiff's lumbar spine shows that the disc protrusions at L5-S1 and L4-L5 have decreased in size.  This is evidence that Plaintiff's disc bulges have been healing and may continue to heal with conservative, non-operative treatment.  (Dr. Barnett Dec. ¶ 12.)

24.    The standard of care for treatment for mild to moderate DDD is cautious administration of anti-inflammatory medications, non-narcotic medications like acetaminophen (Tylenol), weight loss, gentle stretching and exercise.  (Dr. Barnett Dec. ¶ 13.)

25.    Starting at the latest in October 2007, Plaintiff was prescribed anti-inflammatory medications.  (Dr. Barnett Dec. ¶ 15(C).)

26.    As far back as December 2006, and continuing thereafter Plaintiff was prescribed a non-narcotic medication, acetaminophen (Tylenol), but he still complained of "excruciating" back pain.  (Dr. Barnett Dec. ¶ 15(B).)

Plaintiff responds, "not always."  This does not raise a genuine dispute of material fact as Plaintiff essentially has admitted that he did complain of excruciating back pain.

27.    Plaintiff was treated with a variety of other analgesics including a narcotic (Fentanyl patch) recommended by an outside pain management specialist, Dr. Langlois, on August 13, 2007. (Dr. Barnett Dec. ¶ 15(B); Pl's Dep. 87:6-11.)

28.    Plaintiff was counseled on exercise and weight loss.  Dr. Akanno and Dr. Rahimifar told Plaintiff to lose 50 pounds, which would bring him down to a normal weight of 190 pounds and relieve any lower back pain.  But Plaintiff remained in the 240 pound range between March 2007 and August 2010.  (Dr. Barnett Dec. ¶ 15(A); Pl's Dep. 36:19-24.)

29.    Plaintiff had several courses of physical therapy, in August-September 2007, and in July 2008, but Plaintiff complained that it made his lower back pain worse.  (Dr. Barnett Dec. ¶¶ 15(D), 21(B); Pl's Dep. 35:9-17.)

30.     Plaintiff had several consultations with Dr. Langlois, a pain management specialist. (Dr. Barnett Dec. ¶ 15(F).)

31.     Plaintiff had several courses of epidural injections by Dr. Langlois, but Plaintiff complained they were ineffective.  (Dr. Barnett Dec. ¶ 15(H).)

32.     Plaintiff had four MRIs of his lower back and an EMG.  (Dr. Barnett Dec. ¶ 15(J); Pl's Dep. 30:10-16.)

33.      Plaintiff had at least three neurosurgery consultations with Dr. Rahimifar.  (Dr. Barnett Dec. ¶ 15(E).)

34.     On June 25, 2010, Dr. Rahimifar stated that Plaintiff "may benefit" from lumbar surgery and left the decision to the prison doctors.  (Dr. Barnett Dec. ¶ 29.)

35.     Dr. Rahimifar's suggestion that Plaintiff may benefit from lumbar surgery does not mean lumbar surgery was at any time medically necessary.  (Dr. Barnett Dec. ¶ 29.)

36.     Taking into account the degree of Plaintiff's DDD evidenced by the MRIs and EMG, the uncertainty of long term relief and the risks of post-surgical complications, lower back surgery was not medically necessary.  (Dr. Barnett Dec. ¶ 30.)

Although Plaintiff disagrees, he does not provide competent evidence to raise a genuine dispute of material fact.  (ECF No. 83, p. 7.)

37.     As of April 12, 2013, Plaintiff is currently seeing Dr. Lin who hasn't said anything about back surgery.  (Pl's Dep. 41:7-15.)

38.     As of April 12, 2013, Dr. Lin sent Plaintiff to physical therapy.  (Pl's Dep. 41:7-25.)

39.     Plaintiff doesn't know what he needs for his lower back problem.  (Pl's Dep. 93:20-25.)

40.     The treatment Plaintiff received for his lower back pain met or exceeded the professional standard of care in treating Plaintiff for his lower back condition.  (Dr. Barnett Dec. ¶¶ 15, 31.)

Although Plaintiff admits and denies this statement, he has not submitted competent medical expert testimony to raise a genuine dispute.  (ECF No. 84, p. 1.)

///

///

17

41.     Plaintiff alleges that from January 27, 2008, to the filing of the complaint (August 6, 2010), Defendants were deliberately indifferent and committed medical malpractice in regards to his hemorrhoid condition.  (Compl. ¶¶ 9, 11-12.)

42.     Plaintiff had Grade I or II internal hemorrhoids which were diagnosed by colonoscopy on October 21, 2009, and surgically excised in July 2010.  (Dr. Barnett Dec. ¶ 32.)

43.     Hemorrhoids are extremely common.  In one study, 86 percent of the entire group had hemorrhoids; 88 percent among the symptomatic group and 82 percent among the asymptomatic group.  (Dr. Barnett Dec. ¶ 34.)

44.     What causes hemorrhoids is not known.  There is a widely held belief that constipation causes hemorrhoids, but this association has been disproven.  (Dr. Barnett Dec. ¶ 35.)

45.     It cannot be determined with a reasonable degree of medical certainty what caused Plaintiff's hemorrhoidal condition.  (Dr. Barnett Dec. ¶¶ 35, 36.)

46.     Because there is no scientific consensus as to the cause of hemorrhoids, there is no scientific basis for a standard course of treatment.  (Dr. Barnett Dec. ¶ 37.)

47.     During the relevant time period, Plaintiff received treatment for his hemorrhoids, including analgesics and anti-inflammatories, laxatives and fiber tablets, two colonoscopies, an esaphagogastroduodenoscopy, an x-ray of the abdomen, referrals to a gastrointestinal specialist, a gastric biopsy, and excisional hemorrhoidectomy.  (Dr. Barnett Dec. ¶¶ 38, 44.)

48.     Excisional hemorrhoidectomy should be reserved for grade III/IV hemorrhoids and for symptomatic hemorrhoids that do not respond to more conservative therapy.  Surgery is a modality of last resort.  (Dr. Barnett Dec. ¶ 5.)

Although Plaintiff both agrees and disagrees, he has not presented any competent medical expert testimony to raise a genuine dispute of material fact.

49.     There was no urgency to perform a hemorrhoidectomy on Plaintiff.  Dr. Matuk, an outside doctor who performed Plaintiff's colonoscopy on October 21, 2009, did not recommend surgery.  The hemorrhoidectomy was deemed medically necessary eventually when Plaintiff claimed symptoms were not resolved with conservative treatment.  (Dr. Barnett Dec. ¶ 40.)

50.     Dr. Rodriguez, another outside consulting physician, first recommended the hemorrhoidectomy on June 9, 2010.  Dr. Rodriguez performed the hemorrhoidectomy in July 2010. (Dr. Barnett Dec. ¶ 40.)

51.     After the hemorrhoidectomy surgery, Plaintiff continued to complain of constipation and hemorrhoid pain.  (Dr. Barnett Dec. ¶ 41; Pl's Dep. 64:3-8.)

52.     Plaintiff was given stool softener, suppositories, self-administered enemas and fiber pills before and after the hemorrhoidectomy.  (Dr. Barnett Dec. ¶ 44; Pl's Dep. 64:9-13; 68:5-69:15.)

53.     The treatment Plaintiff received for his hemorrhoids met or exceeded the professional standard of care.  (Dr. Barnett Dec. ¶¶ 38, 45.)

Plaintiff disagrees and references his medical requests for health care, which identified hemorrhoid-related symptoms.  Plaintiff's medical requests do not raise a genuine dispute of material fact regarding whether or not the treatment met the standard of care.  Plaintiff has not submitted competent medical expert testimony to raise a genuine dispute of fact.  (ECF No. 84, p. 1.)

54.     Plaintiff never saw or talked to Dr. Lopez.  (Pl's Dep. 56:10-12; 93:6-19; Dr. Lopez Dec. ¶ 2.)

55.     Plaintiff believes that Dr. Lopez's refusal to approve lower back surgery was retaliation.  (Pl's Dep. 56:4-25; 58:5-12.)

56.     Plaintiff doesn't know why Dr. Lopez was not approving lower back surgery.  (Pl's Dep. 56:4-25; 58:5-12; 63:6-11.)

57.     Plaintiff doesn't know why Dr. Lopez was "retaliating" against him.  (Pl's Dep. 58:14-16; 61:13-16.)

Although Plaintiff denies this fact, it is unclear what his dispute is.  (ECF No. 84, p. 2.)

58.     Plaintiff doesn't have any evidence that Dr. Lopez was retaliating against him for any specific inmate appeal.  (Pl's Dep. 59:19-25.)

59.     Dr. Lopez does not keep track of the number of health care service requests or inmate appeals submitted by any individual inmate.  In particular, Dr. Lopez was unaware of the number of health care service requests or health care appeals submitted by Plaintiff.  (Dr. Lopez Dec. ¶ 3.)

1    Although Plaintiff disagrees, he does not have any evidence that Dr. Lopez knew of the total

2    number of health care service requests or appeals that he submitted during the relevant time period.

3    (ECF No. 84, p. 2.)

4    **III.    Discussion**

5        **A.  Eighth Amendment-Deliberate Indifference to Serious Medical Needs**

6        Liability under section 1983 exists where a defendant "acted under color of state law" and

7    deprived the plaintiff "of a right secured by the Constitution or laws of the United States."  Jensen v.

8    Lane County, 222 F.3d 570, 574 (9th Cir. 2000).  In order to be held liable, the defendant must have

9    personally participated in the deprivation of the plaintiff's rights.  Ashcroft v. Iqbal, 556 U.S. 662,

10   677, 129 S. Ct. 1937, 1949 (2009); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).

11       A prisoner's claim of inadequate medical care does not constitute cruel and unusual

12   punishment unless the mistreatment rises to the level of "deliberate indifference to serious medical

13   needs."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97,

14   104 (1976)).  The "deliberate indifference" standard involves an objective and a subjective prong.

15   First, the alleged deprivation must be, in objective terms, "sufficiently serious."  Farmer v. Brennan,

16   511 U.S. 825, 834 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  Second, the prison

17   official must act with a "sufficiently culpable state of mind," which entails more than mere negligence,

18   but less than conduct undertaken for the very purpose of causing harm.  Farmer, 511 U.S. at 834-35.

19       The two part test for deliberate indifference requires the plaintiff to show (1) "a 'serious

20   medical need' by demonstrating that failure to treat a prisoner's condition could result in further

21   significant injury or the 'unnecessary and wanton infliction of pain,'" and (2) "the defendant's

22   response to the need was deliberately indifferent."  Jett, 439 F.3d at 1096.  A prison official does not

23   act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk

24   to inmate health or safety."  Farmer, 511 U.S. at 837.  "Deliberate indifference is a high legal

25   standard," Simmons, 609 F.3d at 1019; Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004), and is

26   shown where there was "a purposeful act or failure to respond to a prisoner's pain or possible medical

27   need" and the indifference caused harm, Jett, 439 F.3d at 1096.

28

1    In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's

2    civil rights have been abridged, "the indifference to his medical needs must be substantial.  Mere

3    'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

4    Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980), citing Estelle, 429 U.S. at 105-

5    06.  "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition

6    does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical

7    malpractice does not become a constitutional violation merely because the victim is a prisoner."

8    Estelle, 429 U.S. at 106; see also Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995).

9    Even gross negligence is insufficient to establish deliberate indifference to serious medical needs.  See

10   Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).  Additionally, a prisoner's mere

11   disagreement with diagnosis or treatment does not support a claim of deliberate indifference.  Sanchez

12   v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

13        Back Treatment and Surgery

14        In his complaint, Plaintiff alleges that Defendants Akanno and Lopez were deliberately

15   indifferent to his need for referrals to outside specialists, equipment accommodations for his lower

16   back, and corrective surgeries for his back since August 29, 2007.

17        According to the undisputed medical record, Plaintiff underwent electromyography in March

18   2007, four MRIs of his lower back, had at least three neurosurgery consultations with Dr. Rahimifar,

19   consultations with a pain management specialist and examination by an outside consulting physician.

20   (UMF 13; Exs. A-E, G, H, I, K, L, J to Dr. Barnett Dec.)  MRI studies and examinations revealed that

21   Plaintiff had DDD of the lumbar spine.  (UMF 10.)  The standard of care for treatment of mild to

22   moderate DDD is administration of anti-inflammatory medications, non-narcotic medications like

23   acetaminophen (Tylenol), weight loss, and exercise.  (UMF 24.)  During the relevant time period,

24   Plaintiff's back was treated with anti-inflammatory medications, non-narcotic medications, a narcotic

25   Fentanyl patch, epidural injections, a lumbar medial branch block/facet block, and physical therapy.

26   (UMF 25-29, 31; Exs. O, P, Q, U.)  Plaintiff also was counseled on weight loss and exercise and

27   provided a lumbar corset, wheelchair and living and work accommodations.  (UMF 28; Dr. Barnett

28   Dec. ¶ 15(I), and Exs. G, H, M, N.)  The medical expert testimony establishes that the treatment

1    Plaintiff received for his lower back pain met or exceeded the professional standard of care for treating

2    his lower back condition.  (UMF 40.)

3            Prior to June 2010, there was no medical necessity or recommendation for back surgery,

4    despite Plaintiff's requests for such surgery beginning in January 2010.  (Compl. p. 20.)  Indeed, the

5    undisputed medical expert testimony demonstrates that back surgery was not deemed medically

6    necessary for Plaintiff at any time.  (UMF 36.)  As far back as November 2007, Dr. Rahimifar's

7    treatment notes indicated that no surgery was recommended.  (Ex. H. to Dr. Barnett Dec.)

8    Subsequently, in June 2010, Dr. Rahimifar indicated that Plaintiff "may benefit" from lumbar surgery

9    for disc herniation at L4-5, but left the decision to prison doctors.  (UMF 34: Ex. I to Dr. Barnett Dec.)

10   Even with Dr. Rahimifar's statement, medical expert testimony indicates that lumbar surgery was not

11   medically necessary. (UMF 35, 36.)  Further, the latest MRI of Plaintiff's lumbar spine in 2012

12   demonstrated that the disc protrusions at L5-S1 and L4-L5 had decreased in size, which is evidence

13   that Plaintiff's disc bulges were healing and may continue to heal with conservative, non-operative

14   treatment.  (UMF 23; Ex. E to Dr. Barnett Dec.)

15           Based on the information presented, Defendants have carried their burden to demonstrate that

16   they were not deliberately indifferent to Plaintiff's need for referrals to outside specialists, equipment

17   modifications or corrective surgery for his back.  The burden therefore shifts to Plaintiff to raise a

18   genuine dispute of material fact that Defendants Akanno and Lopez were deliberately indifferent to

19   Plaintiff's requests for treatment of his lower back condition.

20           Plaintiff argues that Defendants made it appear as if he was being treated well until you

21   examine the lapses between recommendations, referral, appointments, treatment and prescriptions.

22   (ECF No. 83, p. 7.)  However, Plaintiff does not point to any specific time period in the record to raise

23   a genuine dispute of material fact.  According to Plaintiff's own complaint allegations, Plaintiff

24   received treatment from Dr. Akanno or another provider nearly monthly from October 2009 through

25   June 2010.  (See, generally, Compl.)

26           To the extent Plaintiff complained about discontinuance of his Fentanyl patch, the record

27   reflects that Defendant Akanno discontinued Plaintiff's Fentanyl patch in June 2010 based on a report

28   from custody staff that thirty-one Fentanyl patches were confiscated from Plaintiff's cell during a

1   routine search.  The decision was made to stop Plaintiff's Fentanyl patch since it was apparent that

2   Plaintiff did not need them.  (Ex. T to Dr. Barnett Dec.)  Although Plaintiff offers various reasons for

3   not using the patches properly or keeping old patches for a tea, he does not raise a genuine dispute

4   regarding the retention of the patches.

5          Plaintiff's exhibits also indicate that he repeatedly requested pain medication following the

6   discontinuance of his Fentanyl patches.  (ECF No. 86.)  According to the record, however, Plaintiff

7   was prescribed Tylenol or aspirin for his back pain and there were no objective findings supporting

8   excruciating back pain, such a radiculopathy or neurological dysfunctions, leg weakness or muscle

9   atrophy.  (UMF 13-15; Exs. B, F-L to Dr. Barnett Dec.)  The record also reflects that Plaintiff

10  complained about ineffectiveness of epidurals and physical therapy and, as a result, these treatments

11  were discontinued.  (UMF 29, 31; Exs. U and L to Dr. Barnett Dec.)

12         With respect to Plaintiff's purported need for back surgery, Plaintiff's complaint suggests that

13  he began requesting back surgery in January 2010.  (Compl. p. 20.)  However, Plaintiff does not point

14  to any evidence that back surgery was medically necessary as of that time.  He also admittedly has not

15  presented any medical expert testimony to demonstrate that back surgery was necessary at any time.

16  Plaintiff argues that Dr. Rahimifar requested surgery in 2010 due to disc herniation at L4-5, which

17  Plaintiff believes was a prescription for surgery.  (ECF No. 84, p. 3.)  However, as discussed above,

18  medical expert testimony indicates that lumbar surgery was not medically necessary even with Dr.

19  Rahimifar's statement that Plaintiff may benefit from lumbar surgery. (UMF 35, 36.)  The medical

20  record also reflects that Plaintiff's disc bulges were healing and may continue to heal with

21  conservative, non-operative treatment.  (UMF 23; Ex. E to Dr. Barnett Dec.)

22         Plaintiff has not raised a genuine dispute of material fact regarding treatment for his back.

23  Insofar as Plaintiff disagrees with the course of treatment for his back, such disagreement does not rise

24  to the level of deliberate indifference.  Toguchi, 391 F.3d at 1057-58, 1060 (a difference of medical

25  opinion is insufficient as a matter of law to establish deliberate indifference); Sanchez, 891 F.2d at 242

26  (a difference of opinion does not amount to deliberate indifference to serious medical needs).

27  ///

28  ///

23

1    <u>Hemorrhoid Treatment and Surgery</u>

2        In his complaint, Plaintiff alleges that Defendants Akanno and Lopez were deliberately

3    indifferent to the implementation of treatment recommendations, provision of necessary medications,

4    and corrective surgery for his hemorrhoids.

5        Plaintiff underwent a colonoscopy on October 21, 2009.  (UMF 42.)  Dr. Matuk, the physician

6    who performed the colonoscopy did not recommend surgery.  (UMF 49.)  According to the undisputed

7    medical expert testimony, surgery for hemorrhoids is a modality of last resort and only for

8    hemorrhoids that do not respond to more conservative treatment.  (UMF 48.)  The medical record

9    indicates that Plaintiff received a variety of other treatment modalities for his hemorrhoids, including

10   analgesics, anti-inflammatories, laxatives, and fiber tablets.  (UMF 47; Ex. W to Dr. Barnett Dec.)

11   Only after those treatment modalities were ineffective was a hemorrhoidectomy recommended for

12   Plaintiff in June 9, 2010.  The hemorrhoidectomy was performed the following month.  (UMF 50; Exs.

13   W, X to Dr. Barnett Dec.)  Plaintiff continued to receive treatment for his hemorrhoids after his

14   surgery.  (UMF 52.)  Defendants' medical expert has opined that the treatment Plaintiff received for

15   his hemorrhoids met or exceeded the professional standard of care.  (UMF 53.)

16       Based on the foregoing, Defendants have carried their burden to demonstrate that they were

17   not deliberately indifferent to Plaintiff's hemorrhoid condition.  The burden therefore shifts to Plaintiff

18   to raise a genuine dispute of material fact.  In his opposition, Plaintiff asserts that the Court should

19   examine his 7362 forms requesting healthcare, which indicate that he remained in "abject misery

20   relative to hemorrhoidal symptoms—pain, itching and irritation, bloody shorts, and that's not

21   discussing symptoms from bowel movements which brings about burning, stinging pain, and bright

22   red blood dripping into the toilet from the region of the lower bowel."  (ECF No. 84, p. 1.)  The Court

23   has reviewed the exhibits submitted by Plaintiff that relate to his hemorrhoids.  According to a

24   healthcare request submitted on August 5, 2010, Plaintiff complained that oral medication prescribed

25   for his rectal issues had not been provided for three days.  A request for refill was submitted to the

26   physician the following day on August 6, 2010.  (ECF No. 86, p. 11.)  Plaintiff also submitted a

27   healthcare request on September 1, 2010, for complaints of side effects following his July 2010

28   surgery for hemorrhoids.  Plaintiff was scheduled to see a physician regarding his complaints on

24

September 7, 2010.  (ECF No. 86, p. 14.)  Plaintiff's submitted exhibits do not raise a genuine dispute of material fact.  Rather, they indicate that prison medical staff was responsive to Plaintiff's complaints regarding his medication and side effects related to his hemorrhoid condition.

Based on the foregoing, the Court finds that Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim.

**B.  State Law-Medical Malpractice**

To support his medical malpractice action, Plaintiff must establish: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." Hanson v. Grode, 76 Cal.App.4th 601, 606, 90 Cal.Rptr.2d 396 (Cal.Ct.App.1999); Barris v. County of Los Angeles, 20 Cal.4th 101, 108 n. 1, 83 Cal.Rptr.2d 145, 972 P.2d 966 (Cal.1999) ("The standard of care in a medical malpractice case requires that medical service providers exercise ... that degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances.").  "[E]xpert testimony is required to 'prove or disprove that the defendant performed in accordance with the standard of care' unless the negligence is obvious to a layperson." Johnson v. Super. Ct., 143 Cal.App.4th 297, 305, 49 Cal.Rptr.3d 52 (Cal.Ct.App.2006).

Here, Plaintiff has not offered any expert testimony to demonstrate that Defendants failed to meet the standard of care owed to him.  Further, based on the undisputed evidence, the Court cannot conclude that Defendants Akanno and Lopez breached any duty to Plaintiff regarding his hemorrhoids and lower back.  Defendants' expert has opined that the treatment Plaintiff received for his lower back pain met or exceeded the professional standard of care for his lower back condition and that lower back surgery was not medically necessary.  (UMF 36, 40.)  Defendants' expert also has opined that the treatment Plaintiff received for hemorrhoids met or exceeded the professional standard of care.  (UMF 53.)

///

///

25

## C.  First Amendment-Retaliation

Plaintiff asserts that Dr. Lopez's refusal to approve lower back surgery was retaliatory.  (UMF 55.)  An allegation of retaliation against a prisoner's First Amendment right to file a prison grievance is sufficient to support claim under section 1983. Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003 ). Within the prison context, "[a] viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567 ( 9th Cir.2005 ); accord Brodheim v. Cry, 584 F.3d 1262, 1269 ( 9th Cir.2009 ). The court must "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995) (quoting Sandin v. Conner, 515 U.S. 472, 482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995 )). The burden is on Plaintiff to demonstrate "that there were no legitimate correctional purposes motivating the actions he complains of." Pratt, 65 F.3d at 808.

According to the undisputed evidence, Plaintiff does not know why Defendant Lopez was not approving lower back surgery and does not have any evidence that Defendant Lopez was retaliating against him for any specific appeal.  (UMF 57, 58.)  Further, the undisputed medical expert testimony demonstrates that back surgery was not deemed medically necessary for Plaintiff at any time.  (UMF 36.)

The undisputed medical testimony also demonstrates that surgery for hemorrhoids is a modality of last resort and only for hemorrhoids that do not respond to more conservative treatment. (UMF 48.)  Plaintiff received a variety of conservative treatments for his hemorrhoids, including analgesics, anti-inflammatories, laxatives, and fiber tablets, before undergoing a hemorrhoidectomy. (UMF 47, 52.)  Moreover, the hemorrhoidectomy was not recommended until June 9, 2010, after conservative measures did not work, and was performed the following month in July 2010.  (UMF 50; Exs. W, X to Dr. Barnett Dec.)

To the extent Plaintiff complained about discontinuance of his Fentanyl patch, the record reflects that Defendant Akanno, not Defendant Lopez, discontinued Plaintiff's Fentanyl patch in June

2010 based on a report from custody staff that thirty-one Fentanyl patches were confiscated from Plaintiff's cell during a routine search.  (Ex. T to Dr. Barnett Dec.)  The record also reflects that Plaintiff received other forms of pain medication and treatments for his back pain.  (UMF 26, 31.)

Based on the foregoing, Defendants have carried their burden to demonstrate that Defendant Lopez did not deny Plaintiff's lower back surgery or other treatment *because of* any complaints or prison grievances Plaintiff filed during the relevant time period.  Defendants also have demonstrated that there were legitimate medical reasons as to why back surgery was not approved, why conservative treatment for Plaintiff's hemorrhoids was tried before an excisional hemorrhoidectomy and why his Fentanyl patch was discontinued.

The burden thus shifts to Plaintiff to demonstrate that Defendant Lopez's actions in denying him treatment were *because of* his complaints and grievances and that there were no legitimate reasons for denying him back surgery or a hemorrhoidectomy.  With respect to Defendant Lopez's motivations, Plaintiff argues that Defendant Lopez reportedly had "lots of motivation to discourage precedents, as well as curbing expenses and costs in treatment of prisoner medical needs."  (ECF No. 83, p. 3.)  Plaintiff also suggests that he sent a letter to Defendant Lopez in May 2010 to inform her of his intention to file a claim.  That Plaintiff sent her a letter regarding his intentions does not suggest that Defendant Lopez denied any treatment because of any protected activity nor does it raise a genuine dispute of material fact.

Plaintiff has not provided any medical expert testimony to suggest his back surgery was medically necessary at any time or that Defendant Lopez lacked a legitimate medical reason for any alleged denial of surgery during the relevant time period.  Plaintiff counters that Dr. Rahimifar requested back surgery for him on July 11, 2010.  (ECF No. 84, p. 3.)  While Dr. Rahimifar opined in June 2010 that Plaintiff might benefit from lumbar surgery, Plaintiff has not demonstrated that there was a recommendation for back surgery prior to that time, he was denied back surgery from August 2007 through June 2010 or even that back surgery was medically necessary beginning in June 2010.  Plaintiff also fails to demonstrate any chilling effect from Defendant Lopez's purported failure to approve various treatments and surgeries.

For these reasons, the Court finds that Defendant Lopez is entitled to summary judgment on Plaintiff's retaliation claim.

**D.  Qualified Immunity**

Given the Court's determination that Defendants are entitled to summary judgment on Plaintiff's constitutional claims, it is unnecessary to reach Defendants' arguments regarding qualified immunity.

**IV.     Conclusion and Order**

For the reasons discussed above, it is HEREBY ORDERED as follows:

1.  Defendants' motion to strike Plaintiff's opposition filed on June 2, 2014, is GRANTED;

2.  Plaintiff's third opposition and supporting exhibits filed on August 15, 2014 [ECF Nos. 89, 90] are STRICKEN from the record;

3.  Plaintiff's motion to deny or postpone consideration of Defendants' motion for summary judgment is DENIED;

4.  Plaintiff's request for appointment of a medical expert is DENIED;

5.  Defendants' motion for summary judgment, filed on July 8, 2013, is GRANTED; and

6.  Judgment shall be entered in favor of Defendants Akanno and Lopez and against Plaintiff Kelvin Sims.

IT IS SO ORDERED.

Dated:   **March 31, 2015**                    _/s/ Barbara A. McAuliffe_
                                               UNITED STATES MAGISTRATE JUDGE

28